190 So.2d 340 (1966)
William REDDICK, Appellant,
v.
STATE of Florida, Appellee.
No. 6551.
District Court of Appeal of Florida. Second District.
August 10, 1966.
On Rehearing and/or Clarification October 5, 1966.
*341 Robert E. Jagger, Public Defender and John J. Duffy, Special Asst. Public Defender, Clearwater, for appellant.
Earl Faircloth, Atty. Gen., Tallahassee, and William D. Roth, Asst. Atty., Gen., Lakeland, for appellee.
PIERCE, Judge.
William Reddick, Willie Charles Hill and Irene Leverne Jackson were charged as joint principals in the first degree murder of one Johnnie Jackson by beating him to death with a blunt instrument, in a grand jury indictment returned into the Pasco County Circuit Court on December 21, 1961. The offense was alleged to have occurred on November 23, 1961, in Pasco County.
On February 15, 1962, the several defendants were arraigned, entered individual pleas of not guilty to the indictment, and the case was set for trial on March 12, 1962. On February 19, 1962, the three defendants filed joint motion for severance, and an March 3, 1962, the motion was denied. Thereafter, on March 12, 1962, all defendants were in Court, announced ready for trial, and they thereupon renewed individual motions for severance. The trial Judge denied each renewed motion separately. William Reddick then changed his plea from not guilty to guilty, and the Court accepted such change of plea and adjudged Reddick to be guilty.
The trial of co-defendants Hill and Jackson then proceeded forthwith before a jury, resulting in separate verdicts being returned at 12:13 A.M. on the morning of March 15, 1962, finding both Hill and Jackson guilty of murder in the first degree, without recommendation. Thereafter, on April 24, 1962, the three defendants, including Reddick, were brought before the Court and each sentenced to death in the electric chair.
Hill and Jackson then appealed to the Supreme Court of Florida, 158 So.2d 133, and on December 6, 1963, the Supreme Court reversed the judgments of conviction against said codefendants for the reasons "that the trial court clearly abused its discretion in denying the motion of *342 these defendants for severance and that the interests of justice require that these defendants be retried for the crime for which they have been indicted", directing that they be given separate trials. Irene Jackson was then placed upon retrial on February 19, 1964, was found guilty by the jury of second degree murder, and was thereupon sentenced to life imprisonment. On March 13, 1964, codefendant Hill, with the concurrence of the State Attorney, was permitted to enter a plea of guilty to second degree murder, and he was thereupon also sentenced to life imprisonment.
Thereafter, on December 29, 1964, motion was filed by William Reddick under Criminal Procedure Rule No. 1, F.S.A. ch. 924 Appendix to set aside, as null and void, the judgment and sentence against him, on the ground that in the Court proceedings leading up to the entry of said judgment and sentence he had been deprived of the equal protection of the laws and had not been accorded due process of law, under the Constitutions of the United States and the State of Florida. After a hearing upon said motion to vacate, the trial Court, on July 29, 1965, entered order denying said motion and the relief prayed thereunder, the effect of which was to leave in full force the death sentence previously imposed. From the order of July 29, 1965, Reddick has appealed to this Court, and assigns as error here the denial of said motion under C.P.R. No. 1.
In his motion under Rule 1, Reddick made many and sundry charges of mistreatment and maltreatment toward him after being taken into custody and before being sentenced to the extreme penalty, on the part of practically everyone connected with the trial proceedings, including the deputy sheriffs, the special investigator, the committing magistrate, his own succession of counsel, the prosecuting attorneys and the trial Judge. Many and numerous acts of misconduct, mistreatments and impositions upon and against him were alleged in the petition, most of which were patently wild, reckless and irresponsible, some obviously fantastic and fabricated, others affirmatively refuted by the record, others obviously without any legal merit, and others having no possible relation to the proper functions of a petition under Rule 1.
The petition runs the gamut in listing his Constitutional guaranties that were allegedly flaunted, among which were Sections 1, 3, 4, 8, 11, and 12 of the Florida Declaration of Rights, F.S.A., the 6th and 8th Amendments to the Federal Constitution, and the several clauses of the 14th Amendment; as well as various other portions of those two organic documents which the scrivener of the petition did not bother to particularize in his breathless haste to "cover the waterfront".
We deem it unnecessary to refer further to the nine page petition except to observe that in the morass of allegata therein there were only two matters of sufficient substance to warrant our consideration on appeal, which matters will be hereinafter separately dealt with. After perfunctory hearing on the motion, the trial Court on July 29, 1965 entered a five page order which in the last two lines thereof denied Reddick's motion under Rule 1. The rest of the order is an attempt to justify the acts of the Judge and the course of the pre-trial proceedings generally. This is the order which this Court is now called upon to review.
Appeals before this Court under C.P.R. No. 1 have been many and varied. The remedy may be invoked only when the trial court procedures have been so infected with constitutional vices as to leave the judgment or sentence without basis of validity. As was said in Crusoe v. State, Fla.App. 1966, 183 So.2d 600: "[t]he post-conviction relief rule is available only when (a) the judgment was rendered without jurisdiction, or (b) the sentence imposed was not authorized by law or was otherwise open to collateral attack, or (c) there has been such a denial or infringement of *343 constitutional rights as to render the judgment vulnerable to collateral attack."
As hereinbefore observed, there were only two matters raised by the proceedings under Rule 1 that merit serious consideration here. They are (1) the circumstances leading up to and surrounding the plea of guilty to first degree murder, as shown by the record, and (b) the denial of Reddick's motions for severance. We hold that these matters have such a quality of infringement upon Constitutional rights as to have required the granting of the petition. We will take the two matters up in separate order.
A. The Plea of Guilty. A plea of guilty must be entirely voluntary by one competent to know the consequences, and may not be induced by any form of undue motivation, among which are misapprehension and coercion. Canada v. State, 1940, 144 Fla. 633, 198 So. 220; Artigas v. State, 1940, 140 Fla. 671, 192 So. 795; Rubenstein v. State, Fla. 1951, 50 So.2d 708; Asbey v. State, Fla.App. 1958, 102 So.2d 407; Hill v. State, Fla.App. 1959, 110 So.2d 464; Roberts v. State, Fla.App. 1962, 142 So.2d 152; Blake v. State, Fla.App. 1965, 171 So.2d 207. And even a slight undue motivation will invalidate such a plea; it must be "without semblance" of such influence. Clay v. State, 1921, 82 Fla. 83, 89 So. 353; Casey v. State, 1934, 116 Fla. 3, 156 So. 282; Nickels v. State, 1923, 86 Fla. 208, 98 So. 497, 99 So. 121; Brown v. State, 1926, 92 Fla. 592, 109 So. 627.
In Jones v. State, Fla.App. 1964, 165 So.2d 191, this 2nd District Court reversed an order denying a motion under Rule No. 1 brought to obtain relief from being allegedly coerced into pleading guilty. In Lee v. State, Fla.App. 1965, 175 So.2d 95, the 3rd District Court likewise reversed an order entered upon an identical petition under Rule No. 1. And in McCray v. State, Fla.App. 1966, 181 So.2d 729, it was said that "[i]ndividuals accused of crimes possess extensive constitutional rights which must be safeguarded, [and] such rights include freedom to plead guilty or not guilty." In the Jones and Lee cases it was held that a person charged with crime "who is coerced into entering a plea of guilty is deprived of a constitutional right". And misapprehension induced by State or Court action is certainly a form of implied coercion.
We have determined that entering a plea of guilty which is infected with the vitiating ingredient of coercion or misapprehension constitutes an impairment of constitutional rights remediable by collateral attack under Criminal Procedure Rule No. 1. And this would be all the more so in a situation where a man's life is at stake.
So we now have to determine what went on, and what influences and suggestions the defendant Reddick was subjected to on the morning of March 12, 1962, between the time he was brought into Court for trial and the time he changed his plea from not guilty to guilty. There is no better way than to refer to the record itself. The following is the recorded report[1] of the pertinent discussions and proceedings had in the trial Judge's chambers just prior to the actual start of the trial itself, there being present the trial Judge, the Assistant State Attorney Getzen, defense attorneys Altman, Luckie and Bales, representing defendants Reddick, Hill and Jackson, respectively, and the Court Reporter:
"MR. ALTMAN: Let me ask you (Mr. Getzen) this: will you, or will Mr. Davis (the State Attorney, who was not present), agree or to consider a recommendation of mercy if my client pleads guilty to first degree murder? I'm not talking about second degree; I'm talking *344 about first degree. Or would you call him and ask him.

MR. GETZEN: Yes, I'll call him and ask him.
MR. ALTMAN: That might settle something in a hurry for me.
THE COURT: There's no question but that should be something the Court should take into consideration."

* * * * * *
"MR. GETZEN: I will say this: If they plead guilty to first degree murder, I think then it's up to the Court to regulate what testimony you want.
THE COURT: I think that's right. But here's what the thing is  I don't want to be arbitrary about it. I am perfectly willing to hear what you have to say. The point I'm trying to get across is, they want to know if there is a plea to first degree murder what is the State's position.
MR. GETZEN: I'll call Mr. Davis and I'll recommend it to him.

THE COURT: Good. Do it.

MR. GETZEN: Let's find out first what they want to do. You can talk together and tell me."
* * * * * *
"THE COURT: You people go ahead with your conference and I will ask you at this time, while they're doing that, you call Mr. Davis.
MR. GETZEN: Not a bit of use, Judge, for me to call him until after they tell me what they want to do. I know from experience.
THE COURT: I think it would be worth a 'phone call.

MR. GETZEN: The first thing he'll say is `Have they said that's what they want to do?' I'll say, `No, they're having a conference.' And he'll say, `We'll find out what they want to do.'"
* * * * * *
"THE COURT: Let me ask you this: What would you think about my calling him right now and urging him to talk to Mr. Getzen now and give him an opinion so that he don't have to wait? He may be out of pocket. He may be gone out of town or something. So we can be ready to go when you're ready to go, with the understanding that when you have arrived at a decision Mr. Getzen will be able to give us his opinion.
MR. ALTMAN: That sounds fine to me. Mr. Getzen wouldn't have to tell us.
THE COURT: Is that agreeable, gentlemen, with you all?
MR. ALTMAN: Can we start now?
THE COURT: Let's wait until I get this `phone call in. I don't want to get to talking to Mr. Davis without you knowing what's going on. You are not primarily concerned with what he says, but you might have some interest in what I'm saying. All right?
MR. ALTMAN: All right."
(Whereupon the Court placed a telephone call).
* * * * * *
"MR. GETZEN: I think if they'll go ahead and find out what they want to do and give you the concrete on what they want to do and tell him; that's what I think.
THE COURT: You'll have to carry on the conversation with Mr. Davis. What I want to do is urge him to go ahead and give you a decision, or else be available at a telephone so he can."
* * * * * *
"MR. GETZEN: Well, if that's what you all want to do, and he didn't want to do it, that wouldn't be held against them.
THE COURT: No, here's the thing. There certainly is no reason why your opinion should be controlling on the jury *345 or the Court. There's no reason any more why the State Attorney's opinion should be controlling on the jury or the Court. But I think you at least would hope that your plea at the time of sentencing, if that should arise, would at least be listed to and given some credence, and by the same token I think the State Attorney's opinion at the time of sentencing should be given some credence, and no more than that. Certainly he's not going to make the decision, but we should hear what he has to say, if he wants to say anything."
* * * * * *
(At this point the proceedings were interrupted by a telephone call for the Court.)
The trial Judge and Mr. Getzen had the telephone conversation with Mr. Davis, the State Attorney, whereupon the three defendants and their respective attorneys retired to a closed office at which time the defendants were given the substance of the discussions just had in Chambers. Reddick was distinctly told by his counsel that 
" the State Attorney has made the pronouncement that he would recommend mercy in this particular instance to the Court".
The proceedings then resumed back in the Judge's chambers with the same parties present as before. The record thereupon shows the following:
"MR. ALTMAN: The conference has been concluded, Judge. It is my understanding that Mr. Davis, when you talked with him, said that as far as the State Attorney's office was concerned in this instance he would recommend mercy.

THE COURT: Was that what he told you, Mr. Getzen?
MR. GETZEN: He wouldn't object to  he wouldn't ask or insist on anything. In other words, he wouldn't do anything at all.
MR. ALTMAN: Well, I think he made the further statement in this particular case 
THE COURT: Yes, that's correct.

MR. ALTMAN: That he would recommend mercy.

THE COURT: That's correct.

MR. ALTMAN: Well, my client, William Reddick, would like to make a motion to withdraw his plea and enter a plea of guilty to murder in the first degree."
From the foregoing, there can be no doubt but that the decision of Reddick, aided by his attorney, to change his plea from not guilty to guilty was influenced, in fact induced, by the State Attorney agreeing to recommend mercy upon such a plea, plus the fact that the trial Judge who would do the sentencing was primarily instrumental in getting that commitment from the State Attorney. It is crystal clear that the decisive factor that induced Reddick to change his plea was the telephone call engineered by the trial Judge and the commitment and promise on the part of the State Attorney to recommend mercy.
It cannot be denied that Reddick was misled. It cannot be denied that he was under a misapprehension that he would get life imprisonment by pleading guilty. The trial Judge did not have to make himself a party to a binding commitment. By his domination of the proceedings, by expressing his favorable reactions to the significance of a recommendation of mercy, by his aggressive and determined procurement of such recommendation from the State Attorney, even in the face of the lukewarm attitude of the trial prosecutor, the Judge had gone far enough to induce the belief in any reasonable mind that he would spare the life of the person involved in the event of such recommendation  and this in spite of his professed protestations to the contrary.
And all the more would this be true in the mind of someone in the precarious position *346 of Reddick, an illiterate third-grade Negro, whose very life hung upon such an imperceptible balance. Self-preservation is the first law of human nature, and when life and death are in the balance it takes only the proverbial "wisp-of-the-wind" to tilt that balance. And when the motivating force behind all of the discussions leading to the head-prosecutor's recommendation was the Judge himself who would have to do the final pronouncing of sentence, it is little wonder that Reddick, even in his distracted mental condition, made an instant decision.[2]
The setting in the Judge's chambers was conducive only to an assumption of a gainful advantage from a change of plea. Respective counsel for the State and the defendants were engaged in a game[3] of "you put up first"; the prosecutor was insisting that the defendant offer the guilty plea first while his adversaries insisted that the State Attorney's affirmative assurance of recommending mercy should be first obtained. This game, in which the stake was no less important than a human life, was abruptly climaxed, and the deadlock broken, by the Judge's voluntary and precipitate action in personally contacting the State attorney by telephone and procuring from him, through the assistant State attorney, the definite commitment to recommend mercy in the event of a guilty plea.
The reaction to this denouement was natural and definite  the plea was changed in normal expectation of a life sentence in accordance with the State attorney's recommendation. Such expectation was reasonably justified under the circumstances. For what else had the parties been negotiating and verbally fencing back and forth? It would be nothing less than stark tragedy to say that, because the defendant was led in effect "down a blind alley" and got what he and everyone else connected with the proceedings, including the trial Judge, had apparently been trying to obviate, namely, the death sentence, the processes of the law are so inflexible and unyielding as to afford no remedy or relief. This would be no less than to compound the injury. Let it never be said that the law in this jurisdiction is so heartless. The applicability of Criminal Procedure Rule No. 1 was never more appropriate or justified. The guilty plea was clearly infected with legally recognized elements which vitiate it, namely, misapprehension and implied coercion.
Denial of the Motions for Severance. This matter lacks the human interest engendered in the point just considered, but the final determination is no less decisive.
On February 19, 1962, a joint motion for severance was filed on behalf of Reddick and his two codefendants, Hill and Jackson. Each of them wanted a separate trial. This was denied by the Court on March 3, 1962, The three defendants, including Reddick, renewed their separate motions for severance on the morning of the trial, March 12, 1962, and they were each denied separately by the Court. After the codefendants were jointly tried and convicted by a jury and each given the death sentence, they appealed to the Supreme Court of Florida, which reversed the convictions on the sole ground that the trial *347 Judge had abused his discretion in denying the motions for severance.[4]
Thereafter, on February 19, 1964, codefendant Jackson was re-tried separately and found guilty of second degree murder and was accordingly sentenced to life imprisonment. On March 13, 1964, codefendant Hill, with concurrence of the State attorney, was permitted to enter a plea of guilty to second degree murder and he also received a life sentence. So Hill and Jackson are now serving prison sentences while Reddick languishes in the death cell; notwithstanding he filed the same motions for severance they did.
An application for severance is addressed to the trial Court's sound discretion and the order thereon will not be reversed except for palpable abuse of judicial discretion. Brunke v. State, 1948, 160 Fla. 43, 33 So.2d 226; Manson v. State, Fla. 1956, 88 So.2d 272; Rankin v. State, Fla. 1962, 143 So.2d 193; Roberts v. State, Fla. 1964, 164 So.2d 817; Jackman v. State, Fla.App. 1962, 140 So.2d 627; Pessolano v. State, Fla.App. 1964, 166 So.2d 706. In a prosecution of two defendants charged jointly with the same offense, a denial of a motion for separate trial of one of the defendants following a confession by the other defendant was erroneous when both defendants were together throughout the entire transaction and both were present on every pertinent occasion. Schaffer v. United States, C.A.Fla. 1955, 221 F.2d 17, 54 A.L.R.2d 820. The factual situation has analogy here.
Cautionary instructions to the jury will not cure an otherwise erroneous denial of severance. Everitt v. United States, C. A.Fla. 1960, 281 F.2d 429. See also Bryan v. State, 1930, 100 Fla. 779, 130 So. 35, and Westbrook v. State, Fla. 1953, 64 So.2d 320, where the Florida Supreme Court reversed both cases because of improper denial of motions for severance.
In Suarez, et als. v. State, 1928, 95 Fla. 42, 115 So. 519, a case personally familiar to the writer, three defendants, Emelio Suarez, Benigno Suarez and Charles Naya were tried and convicted of automobile theft and receiving stolen property. Before trial, the Suarez defendants filed joint motion for severance from being tried with Naya, which motion the Court denied. Upon appeal, the Supreme Court held the denial of separate trials to be reversible error and used the following language (text 115 So. 522):
"The granting or denial of a motion for severance is largely discretionary, and the ruling of the trial court thereon will not in general be disturbed, where no abuse of discretion is shown. Daniels v. State, 57 Fla. 1, 48 So. 747; Ballard v. State, 31 Fla. 266, 12 So. 865; Roberson v. State, 40 Fla. 509, 24 So. 474; 16 C.J. 784. In the case of Ballard v. State, supra, section 310 of Wharton's Criminal Plead. & Prac., which says that, `where the defenses of joint defendants are antagonistic, it is proper to grant a severance,' is quoted with approval. On page 786 of 16 Corpus Juris, it is said:
"`Where from the nature of the case it appears that a joint trial probably would be prejudicial to the rights of one or more of the parties, a separate trial should be granted when properly requested. Thus, where the defenses or interests of two or more jointly indicted are antagonistic, separate trials may and should be allowed; but the mere fact that one defendant is attempting to escape punishment by throwing the blame on his codefendant is not sufficient ground therefor.'
"In section 1019 of Bishop's New Criminal Procedure (2d Ed.) it is said:
"`The common-law rule being for the ordinary case, that the trying together of joint defendants promotes convenience and justice, if in an individual instance *348 the contrary appears, the trial should be separate. Thus * * * antagonistic defenses justify a severance. So, if important evidence, not competent on a joint trial, will be admissible on a several, a severance should be permitted.'
"And in section 1019a, the same author says:
"`If evidence which is incompetent against one defendant is to be introduced against another, and is of a sort to be prejudicial to the former in the eyes of the jury, there should be a severance.'
"While the question is not free from difficulty, we are inclined to the opinion that the court below committed reversible error in denying the motion of the defendants Suarez for a severance in this case. The subsequent developments, in the taking of the testimony, showed that this ruling was not a harmless error." (Emphasis supplied.)
The foregoing authorities are reviewed solely to demonstrate the importance of a motion for severance and the gravity of an order denying such motion in a proper case. In the case sub judice this Court has the advantage of having already had that question decided by the Supreme Court in this identical case, where the conviction of Reddick's codefendants upon the same indictment was unanimously reversed solely upon that ground. Reddick's motion for severance was made at the same time and for the same reasons as the motions of his co-defendants.
The far-reaching significance and effect of the severance prayed for is strikingly revealed in the fact that when defendant Jackson was retried alone on the indictment she was found guilty only of second-degree murder. A more graphic illustration of the grave consequences of an improper denial of separate trials can hardly be devised. In the actual case before the Court, it has meant nothing short of the difference between life and death to his codefendants. Such difference should certainly warrant relief by C.P.R. No. 1 in behalf of the third defendant, and we so hold.
A case on all fours in principle and applicability of C.P.R. No. 1, is that of Burse v. State, Fla.App. 1965, 175 So.2d 586. There the trial error consisted of improper comment to the jury by the prosecutor upon the failure of defendants to testify. But we quote from the opinion of the 3rd District Court, which tells the story (text 175 So.2d 587):
"This appeal is from an order summarily denying a petition for relief under Criminal Procedure Rule 1, Ch. 924 F.S.A. Appendix.
"Appellant and one Henry T. Tolliver were tried together in the criminal court of record in Dade County and the jury declared them guilty of third degree murder. Judgment was entered and each was sentenced to be confined in the state penitentiary for a period of 15 years.
"On a timely appeal taken by the defendant Tolliver, we reversed the judgment as to him and remanded for new trial, holding that certain statements made by the prosecuting attorney in his closing argument amounted to comment on the failure of the defendants to testify in their own behalf, in violation of § 918.09, Fla. Stat., F.S.A., which interdicts such comment. See Tolliver v. State, Fla.App. 1961, 133 So.2d 565. This appellant, who took no appeal, filed his petition under Rule 1 four years after judgment and while serving the sentence.
"[1] The question which this appeal presents is whether this established error which if appealed could have brought reversal and an order for new trial, was properly rejected by the trial court as a ground for relief under Rule 1, under the general proposition that errors which may be presented on appeal may not be the basis for collateral attack when appeal *349 was not taken, or whether a prosecutor's comment on failure of the defendant to testify amounts to a denial of due process and of a fair trial such as to render the judgment subject to collateral attack. We hold the latter is applicable here.
* * * * * *
"There is no need, after remand, for a further hearing to determine whether the prosecutor commented at the trial on failure of this and the other defendant to testify in their own behalf, because the fact that such comment was made, and its effect, were established on the appeal taken by the defendant Tolliver.

"Accordingly, the order denying appellant's petition under Rule 1 is reversed, and the cause is remanded with directions to grant the petition and order a new trial." (Emphasis supplied.)
It will be noted that the opinion in Burse emphasized in two places that the reversible character of the trial error had been established by the action of the Appellate Court upon direct appeal of Burse's codefendants. Also that C.P.R. No. 1 was available to the one remaining defendant who literally was "left out in the cold" by the fortuity of his codefendants' appeal upon the same point of law pertaining equally to him. The pertinent factual situation in Burse and the case sub judice is not only analogous but identical.
We hold that Reddick's constitutional rights were violated when he was indirectly coerced into pleading guilty and also when his motions for severance seeking separate trial were denied. Accordingly, the order denying relief under C.P.R. No. 1 is reversed with directions that the petition be granted and Reddick be given a new trial.
So ordered.
ALLEN, C.J., and HODGES, JOHN G., Associate Judge, concur.

ON PETITION FOR REHEARING AND/OR CLARIFICATION
PIERCE, Judge.
The State has filed herein its Petition for Rehearing and/or Clarification and Modification, wherein no challenge is made to the first proposition in our opinion of August 10, 1966, namely, the implied coercion of a guilty plea, but it is urged that the portion dealing with the motion for severance should be deleted or else clarified or modified, because the denial of such motion is not amenable to collateral attack as contemplated by Criminal Procedure Rule No. 1, F.S.A. ch. 924 Appendix. The seriousness of the question impels us to write this Memorandum, and incidentally to review generally the scope of the Rule in this jurisdiction. We deny the Petition for Rehearing, but will clarify our holding with reference to the severance.
We did not mean to hold, and we did not hold, that in every ordinary, run-of-the-mine case, denial of a motion for severance could later activate the processes of the Court under Rule 1. What we meant to say, and what we did say, was that under the peculiarly aggravating facts of this particular case, where he had been wrongfully induced to plead guilty, thereby virtually foreclosing any avenue of successful appeal, and where his very life was at stake, and where the lives of his co-defendants had been actually saved by the simultaneous filing of the same identical motion in the trial Court, Rule 1 was here available.[1]
We endeavored to point out that it was these additional disturbing elements that persuaded us to the view that the denial of *350 severance as to defendant Reddick, under the circumstances within which he found himself enmeshed, was amenable to collateral attack. We used the following language:
"The far-reaching significance and effect of the severance prayed for is strikingly revealed in the fact that when defendant Jackson was retried alone on the indictment she was found guilty only of second-decree murder. A more graphic illustration of the grave consequences of an improper denial of separate trials can hardly be devised. In the actual case before the Court, it has meant nothing short of the difference between life and death to his co-defendants. Such difference should certainly warrant relief by C.P.R. No. 1 in behalf of the third defendant, and we so hold."
What we did not say but perhaps should have, and do say here, was that it was only because of these added factors in this particular case that Rule 1 was held to be available.
It all boils down to this: that Rule 1 is broad enough to reach "[a] prisoner in custody under Sentence of a court"[2] who has been deprived of his fundamental and constitutional right to a fair and impartial trial.[3] In other words, the true criterion of whether collateral attack is permissible is not, as a general rule, whether a specific constitutional guaranty was violated, but whether the defendant, on the whole record, was denied a fair trial.[4]
Thus in Marti v. State, Fla.App. 1964, 163 So.2d 506, it was held:
"While any alleged error may be posed for decision on a direct appeal to an appellate court, the test for granting relief under Rule 1, is whether or not the appellant was deprived of the substance of a fair trial. Cf. Glouser v. United States, 8 Cir., 296 F.2d 853, cert. den. 369 U.S. 825, 82 S.Ct. 840, 7 L.Ed.2d 789."
And in Cole v. State, Fla.App. 1966, 181 So.2d 698:
"After an examination of § 914.01,[5] supra, and a review of decisions regarding said section, we have determined that if the appellant's right to be present was waived without his knowledge and consent or acquiescence it would be such a denial of appellant's rights under the laws of Florida as to render the judgment vulnerable to collateral attack. The appellant must therefore, be given a formal hearing to determine whether this right was denied without his knowledge and consent or acquiescence."[6]
It might be difficult in some cases to place a finger upon some specific passage or provision of the Federal or State Constitution which has been allegedly violated. Quite often, it is an accumulation of lesser errors. In this respect, the situation is no different than upon direct appeal.
Thus, in Blackwell v. State, 1918, 76 Fla. 124, 79 So. 731, 1 A.L.R. 502, it was said by the Supreme Court:
"The record in this case bristles with statements and proceedings prejudicial to *351 the defendants, which in the aggregate amounted to a denial of such a fair and impartial trial as every person is entitled to under the Constitution."
And in Westbrook v. State, Fla. 1953, 64 So.2d 320, also by the Supreme Court:
"While the denial of the motion for severance, standing alone, might not be reversible error, when considered in connection with the meager evidence against this defendant, we think that the ends of justice will be best served by awarding a new trial to the appellant, and that the trial judge erred in refusing to do so."[7]
In undertaking any serious study of Rule 1, it is necessary to understand the purpose of the Rule in its inception. It was originally enacted to facilitate the handling of post-conviction claims and to provide "procedural facilities available to state prisoners who might have belatedly acquired rights which were not recognized at the time of their conviction." Roy v. Wainwright, Fla. 1963, 151 So.2d 825.
It had its first immediate impact, of course, with the volcanic outpouring of petitions consequent upon Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, because of the absence of trial counsel. But this class of petitions has now dwindled down to a mere trickle by the passage of time and the fact that the Florida courts have uniformly observed the commands of Gideon since it was handed down. The Florida Supreme Court has held that when faced with questions regarding the application and interpretation of Rule 1, Federal precedents and authorities should be looked to for guidance. Dickens v. State, Fla. 1964, 165 So.2d 811.
Title 28, Section 2255, U.S.C.A. is the Federal counterpart of our Rule 1, and in fact Rule 1 was copied therefrom with certain verbiage changes necessary to make it applicable to State practice. The history of Sec. 2255 is clearly set forth in United States v. Hayman, 1952, 342 U.S. 205, 72 S.Ct. 263, 96 L.Ed. 232, by then Chief Justice Vinson, who was particularly familiar with it since he had served as chairman of the Judicial Conference of the United States.[8] The Federal Courts had been repeatedly confronted with practical difficulties in the handling of habeas corpus proceedings. "[T]he sole purpose was to minimize the difficulties encountered in habeas corpus hearings by affording the same rights in another and more convenient forum." 72 S.Ct. at 272. The courts at the Federal level have consistently held that the substantive scope of Sec. 2255 is the same as habeas corpus. Larson v. United States, 275 F.2d 673, (5 CA 1960); Black v. United States, 269 F.2d 38 (9 CA 1959); Taylor v. United States, 229 F.2d 826, (8 CA 1956); Kreuter v. United States, 201 F.2d 33 (10 CA 1953); Hill v. United States, 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962); Sanders v. United States, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963). It is vital then to understand the scope of the writ of habeas corpus.
While textbook writers, in an attempt to make the law definitive, may assert with confidence a uniform rule as to the role of habeas corpus, the case law exhibits that there is no definite rule with regard to its availability. In Sunal v. Large, 332 U.S. 174, 67 S.Ct. 1588, 91 L.Ed. 198 (1946), the majority opinion was by Mr. Justice Douglas, while Mr. Justice Frankfurter and Mr. Justice *352 Rutledge wrote dissenting opinions. But the majority and dissents only disagreed as to the application of the law to the facts of that particular case. All opinions agreed upon the fundamental proposition, so important here, that while trial errors are not generally reachable by habeas corpus if correctible by direct appeal, yet "in exceptional circumstances", the general rule must yield and habeas corpus may be utilized.[9]
Thus the majority opinion of Mr. Justice Douglas says (text 67 S.Ct. 1590):
"* * * [t]he general rule is that the writ of habeas corpus will not be allowed to do service for an appeal. * * * Yet, on the other hand, where the error was flagrant and there was no other remedy available for its correction, relief by habeas corpus has sometimes been granted (citing cases). * * [As] where no other opportunity existed, habeas corpus would be the appropriate remedy."
And in the minority opinion of Mr. Justice Rutledge, (text 67 S.Ct. 1596):
"The writ should be available whenever there clearly has been a fundamental miscarriage of justice for which no other adequate remedy is presently available. * * *
In the prevailing state of our criminal law, federal and state, there are few errors, either fundamental or of lesser gravity, which cannot be corrected by appeal timely taken, unless the facts disclosing or constituting them arise after the time has expired. If the existence of a remedy by appeal at some stage of the criminal proceedings is to be taken for the criterion, then in very few instances, far less than the number comprehended by our decisions, will the writ be available. Taken literally, the formula so often repeated, that the writ is not a substitute for appeal, is thus in conflict with every case where the ground upon which the writ has been allowed either was or might have been asserted on appeal. * * *" (Emphasis supplied.) (Copious cases are cited by Mr. Justice Rutledge to support his thesis.)
Admissibility of evidence, so often said not to be a ground for relief, provided such ground in Tinsley v. Treat, 205 U.S. 20, 27 S.Ct. 430, 51 L.Ed. 689 (1906). And Bowen v. Johnston, 306 U.S. 19, 59 S.Ct. 442, 83 L.Ed. 455 (1938) justified the writ where there were "exceptional circumstances". Judge Learned Hand in United States ex rel. Kulick v. Kennedy, (1946) 2 Cir., 157 F.2d 811, points out that the "writ is available, not only to determine points of jurisdiction, stricti juris, and constitutional questions; but whenever else resort to it is necessary to prevent a complete miscarriage of justice." (Emphasis supplied.)
Recent Federal cases have held accordingly, under Sec. 2255. Representative of this trend are: Glouser v. United States, C.A.Iowa 1961, 296 F.2d 853, cert. den. 369 U.S. 825, 82 S.Ct. 840, 7 L.Ed.2d 789, where the test of availability of Section 2255 was whether defendant had been "deprived of substance of fair trial"; United States v. Gaitan, D.C.Colo. 1960, 189 F. Supp. 674, aff. 295 F.2d 277, cert. den. 369 U.S. 857, 82 S.Ct. 939, 8 L.Ed.2d 15, where the test was whether the error was "of such grave character as to have deprived defendant of a fair trial"; Simmons v. United States, C.A.N.J. 1962, 302 F.2d 71, where it was such as to have deprived defendant of a "fair trial"; United States v. Bowen, D.C.Ga. 1951, 94 F. Supp. *353 1006, aff. 192 F.2d 515; cert. den. 343 U.S. 943, 72 S.Ct. 1036, 96 L.Ed. 1348, reh. den. 343 U.S. 988, 72 S.Ct. 1079, 96 L.Ed. 1375, where "there has been a deprivation of constitutional rights so fundamental as to amount to a denial of a fair trial"; Dean v. United States, C.A. Mo. 1959, 265 F.2d 544, whether there had been "a fair trial"; and Mason v. United States, 1951, 193 F.2d 23, 90 U.S.App. D.C. 1, where the test "goes to essence of a fair trial". (Emphasis supplied.)
It would appear in the case sub judice that where a life is at stake because of error committed by the Court, the correction of which error has been effectually shown to have resulted in imprisonment rather than death to fellow travellers no less culpable, there has obviously been a miscarriage of justice somewhere along the line.
Actually, if it were essential that some particular Constitutional provision provide the basis for resort to Rule 1 in these sort of cases, it could well be denial of due process of law. Our own 2nd District Court has in effect so held, in Young v. State, Fla.App. 1965, 177 So.2d 345, wherein we said (text 177 So.2d 346):
"* * * we find the general rule to be that when an attorney has had dealings with a defendant as a defense counsel and later becomes a prosecutor in the same case, a conviction thereby obtained must be reversed.
* * * * * *
Assuming therefore that Mr. Allweiss while a public defender did in fact confer with Appellant Young, his later participation in the case as prosecutor was fundamental error, and was a denial of due process. Under Rule 1, if a petitioner shows that he was denied due process he may collaterally attack his conviction. Marti v. State, Fla.App. 3, 1964, 163 So.2d 506." (Emphasis supplied.)
We reiterate that, ordinarily and as a general rule, the denial of a motion for severance will not permit resort to relief under Rule 1, but in the instant case, under all the facts and circumstances of the trial proceedings as reflected in the record before this Court, and in the light of the authorities hereinbefore reviewed, Rule 1 was properly invoked.
Petition for rehearing is denied, and, as so clarified here, our original opinion is reaffirmed.
ALLEN, C.J., and HODGES, JOHN G., Associate Judge, concur.
NOTES
[1] Fortunately, not only for future generations to peruse, ponder, and wonder about, but also for purpose of providing this Appellate Court with an authenticated record of the strange happenings that transpired, these pre-trial proceedings were attended with competent Court reporting procedure.
[2] His position was somewhat analogous to the position of one who, while in custody, makes a confession "under the promise or encouragement of any hope, benefit, or favor made or held out to him by officers or other persons in authority", which voids the confession. 23 C.J.S. Criminal Law § 825a, p. 209. In such cases, says 23 C.J.S. p. 211, § 825b, "it is not necessary that it be of some particular and specific advantage or favor; it is enough if in general terms it suggests an advantage to be gained". (Emphasis supplied.)
[3] It is a sad commentary on our judicial processes when a situation like this can actually develop, where "games", or "matching of wits" on strategy, can be played, with a human life (however unworthy it may supposedly be) as the stake.
[4] Jackson et al. v. State, Fla. 1963, 158 So.2d 133.
[1] Once again the admonition of Justice Whitfield in Ex parte Amos, Fla. 1927, 112 So. 289, text 294, that general statements of law in an opinion must be "confined to and limited by the facts of the case under consideration" should be heeded. See also Booth v. Mary Carter Paint Company, Fla. 1966, 182 So.2d 292, text 301-302.
[2] The language of Rule 1.
[3] Provided always, of course, that he has standing otherwise to invoke the relief.
[4] We use the term "trial" in its broad and comprehensive sense, meaning a "judicial examination of the issues between the parties" (88 C.J.S. Trial § 1, p. 19), regardless of what the plea is or whether the case is tried by a jury or otherwise.
[5] Section 914.01, F.S.A. provides: "In all prosecutions for a felony the defendant shall be present: * * * (4) At all proceedings before the court when the jury is present; * * *".
[6] In Cole there was a petition for rehearing filed by the State and denied unanimously without comment. We have examined the original Court file and find that the petition raised the same identical grounds as here.
[7] It will be observed that Westbrook involved denial of a motion for severance, the precise point here, and the Court did not say the evidence, though meager, was not legally sufficient to support the judgment.
[8] Established by Congress in 1922, composed of the chief judges of the Federal judicial circuits and the Chief Justice of the United States. 42 Stat. 838. For its proceedings and recommendations for legislation, as submitted to Congress, see 28 U.S.C. (Supp. IV) § 331.
[9] The majority and dissenting opinions differed as to whether or not "exceptional circumstances" existed under the facts of that case, but there was no disagreement as to the legal premise involved, namely, that in exceptional cases where there "has been a fundamental miscarriage of justice for which no other adequate remedy is presently available" the writ is effectual.